**In re DOES 1–10.**

**No. 06–07–00123–CV.**

Court of Appeals of Texas, Texarkana.

Submitted Oct. 24, 2007.

Decided Dec. 12, 2007.

James R. Rodgers, Judy Hodgkiss, The Moore Law Firm, LLP, Paris, for relator.

R. Wesley Tidwell, Ellis & Tidwell, LLP, Paris, Cory Hohnbaum, King & Spalding, LLP, Charlotte, NC, for real party in interest.

Before MORRISS, C.J., CARTER and MOSELEY, JJ.

## OPINION

Opinion by Justice CARTER.

Essent PRMC, L.P. (Hospital) filed suit against ten John Does alleging they had defamed the Hospital and violated other laws by posting comments on an Internet site. The trial court ordered that anonymous contributor John Doe number one be identified by his Internet service provider (ISP). Anonymous John Doe number one (identified in his blog[1] as fac_p and Frank Pasquale) has filed a petition for writ of mandamus asking this Court to order the district court to withdraw its order directing a third party ISP to reveal his identity to the Hospital. The ISP, SuddenLink Communications, is not a party to the lawsuit; Essent PRMC is the corporate identifier for Paris Regional Medical Center. For reasons stated in the opinion, we conditionally grant the writ of mandamus.

### I. Factual and Procedural Background

The Hospital sued Does 1–10 alleging that Doe 1 had set up a blog that contained many scurrilous comments that "unfairly disparage and criticize the Hospital, its employees and the doctors who admirably serve patients there on a daily basis" and that his postings were defamatory. The Hospital also alleged that some postings to the blog had disclosed confidential patient health information and generally complained that the postings "are otherwise actionable under federal and state law."[2]

Procedurally, the Hospital filed a petition against the Does—combined with an "ex parte request to non-party to disclose information" directed at SuddenLink, explicitly based on 47 U.S.C.A. § 551(c) (West 2001 & Supp.2007), asking the trial court to direct SuddenLink to disclose the identities of the Does. On the day of filing (June 19, 2007), the court granted the motion. On July 23, the court issued a second "agreed" order, stating that the Hospital and SuddenLink had agreed to amend the prior order which provided for notice to the Does with opportunity for them to respond. If no response was made, SuddenLink was to disclose the information. Counsel James Rodgers appeared on behalf of the unnamed subscriber by letter filed August 6, and thereafter at a hearing conducted September 7. At that time, the only information before the trial court consisted of an unsworn petition, with no evidentiary attachments or affidavits. No evidence was presented at the hearing, only argument of counsel. At the conclusion of the hearing, the trial court allowed additional briefing to be submitted by Wednesday of the following week.

The trial court sent a letter to counsel dated September 14 in which, after quoting excerpts from two cases, it found that good cause had been shown and the "burden by plaintiff has been met to meet the requirements of the exceptions to the Communication Act to grant the request by Plaintiff …." and directed counsel to prepare an order for the court's signature.

On September 24, counsel for Doe 1 filed a letter pointing out the inherent

---

1. The term "blog" is a shorthand version of the word "Weblog." A Weblog is an Internet Web site that displays in chronological order the postings by one or more individuals and usually has links to comments on specific postings. AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE (4th ed.2006), *available at* http://dictionary.com.

2. The suit against Does 2–10 is not implicated here; the trial court's order was directed solely at the ISP, ordering it to reveal the name of Doe 1. In that portion of the lawsuit, the Hospital alleged that Does 2–10 had improperly revealed patient information by posting on the blog that might, under the federal act known as HIPAA, make the Hospital civilly liable to those patients or their survivors.

weakness of the Hospital's case as pled, correctly noting that no evidentiary support had been provided by the Hospital in support of its claims and that, in the absence of any such support, even the lowest level of review suggested by the courts as authorizing such discovery had not been met.

Three days later, on September 27, for the first time, counsel for the Hospital provided a petition with some form of evidentiary support—in the form of an affidavit from a representative of the Hospital stating that the statements in the petition were true and attached copies of the blog and various documents generated by the Hospital in an attempt to bolster its breach of contract claims against Does 2–10.

On the following Monday, October 1, the trial court signed an order explicitly stating it had considered the September 27 filing, as well as everything that had previously been presented to the court, overruled Doe's objection to the agreed order, and ordered SuddenLink to disclose the name and address of the subscriber.

## II. Requirements for Mandamus Relief

### A. General Requirements

Mandamus issues only when the mandamus record establishes (1) a clear abuse of discretion or the violation of a duty imposed by law and (2) the absence of a clear and adequate remedy at law. *Cantu v. Longoria*, 878 S.W.2d 131 (Tex.1994); *Walker v. Packer*, 827 S.W.2d 833, 839–40 (Tex.1992). Mandamus is an extraordinary remedy that will issue only to correct a clear abuse of discretion or, in the absence of another statutory remedy, when the trial court fails to observe a mandatory statutory provision conferring a right or forbidding a particular action. *Abor v. Black*, 695 S.W.2d 564, 567 (Tex.1985).

With respect to the resolution of factual issues or matters committed to the trial court's discretion, the reviewing court may not substitute its judgment for that of the trial court. *Brady v. Fourteenth Court of Appeals*, 795 S.W.2d 712, 714 (Tex.1990). Review of a trial court's determination of legal principles controlling its ruling applies a much less deferential standard, since the trial court has no discretion in determining what the law is or applying the law to those facts. *Huie v. DeShazo*, 922 S.W.2d 920, 927 (Tex.1996); *Walker*, 827 S.W.2d at 840. Consequently, the trial court's erroneous legal conclusion, even in an unsettled area of law, is an abuse of discretion. *Huie*, 922 S.W.2d at 927–28.

### B. Adequate Remedy at Law

We must initially determine whether the Relator has another adequate remedy at law, such as a normal appeal. Such a remedy is not inadequate merely because it may involve more expense or delay than obtaining an extraordinary writ. *Walker*, 827 S.W.2d at 842. A party will not have an adequate remedy by appeal when the appellate court would not be able to cure the trial court's discovery error or evaluate its impact. This occurs when the trial court erroneously orders the disclosure of privileged information that will materially affect the rights of the aggrieved party, such as documents covered by the attorney-client privilege, *West v. Solito*, 563 S.W.2d 240 (Tex.1978), or trade secrets without adequate protections to maintain the confidentiality of the information, *Automatic Drilling Machs., Inc. v. Miller*, 515 S.W.2d 256, 259 (Tex.1974).

This situation falls squarely within that reasoning. If discovery is allowed, then the identity of the blogger is revealed, the damage is done, and it cannot

be rectified. Thus, mandamus is appropriate relief.

Further, a remedy by appeal may also be inadequate when it is insufficient to protect a specific constitutional right asserted by the relator. *See Tilton v. Marshall,* 925 S.W.2d 672, 682 (Tex.1996); *In re Hinterlong,* 109 S.W.3d 611, 621 (Tex. App.-Fort Worth 2003, orig. proceeding). Thus, there is also irreparable harm that would be done to the defendant's constitutional right to anonymous free speech if we allowed discovery to proceed without constitutionally adequate safeguards.

### C. Clear Abuse of Discretion

The remaining question is whether the trial court correctly applied the law to its ruling, and as "[a] trial court has no 'discretion' in determining what the law is or applying the law to the facts," *Huie,* 922 S.W.2d at 927–28; *Walker,* 827 S.W.2d at 840, the issue may be addressed through mandamus. "Thus, a clear failure by the trial court to analyze or apply the law correctly will constitute an abuse of discretion, and may result in appellate reversal by extraordinary writ." *Walker,* 827 S.W.2d at 840; *In re Rozelle,* 229 S.W.3d 757, 761 (Tex.App.-San Antonio 2007, orig. proceeding).

Application of the law is not limited to purely substantive matters. The Texas Supreme Court has in two recent cases addressed the application of procedural rules under such a rubric, and we shall do likewise. *See In re Pirelli Tire, L.L.C.,* No. 04–1129, —— S.W.3d ——, 2007 Tex. LEXIS 980 (Tex. Nov. 2, 2007); *In re Van Waters & Rogers, Inc.,* 145 S.W.3d 203 (Tex.2004).

A failure by the trial court to analyze or apply the law correctly, as when a discovery order conflicts with the Texas Rules of Civil Procedure, constitutes an abuse of discretion. *Walker,* 827 S.W.2d at 840; *In re Kuntz,* 124 S.W.3d 179, 181 (Tex.2003). Therefore, a discovery order that entirely disregards the Texas Rules of Civil Procedure is likewise an abuse of discretion.

It is within our purview to determine whether the court properly analyzed and applied the law to this particular portion of the proceeding.

### III. Standing

The Hospital argues Relator, Doe 1, does not have standing to assert this petition for writ of mandamus. It is true Doe 1 has not been served with citation and his appearance was in response to the court's order requiring notice to him and allowing an opportunity to respond. However, the rules of discovery allow any person "from whom discovery is sought, and any other person affected by the discovery request" to move for a protective order. Tex.R. Civ. P. 192.6(a). One of the reasons to ask for such relief is to protect the movant from "invasion of personal, constitutional, or property rights." Tex.R. Civ. P. 192.6(b). A court may then make any order in the interest of justice that denies or limits the requested discovery. Tex.R. Civ. P. 192.6(b)(1), (2). The request of Doe 1 that his name should not be released is based on a possible invasion of personal and constitutional rights. We believe the rules of procedure authorize a relator to move for such protection and hence grants standing to bring this action. *See In Re Shell E & P, Inc.,* 179 S.W.3d 125, 130 (Tex.App.-San Antonio 2005, orig. proceeding). We realize the trial court did not appear to grant this relief based on any rule of discovery in the Texas Rules of Civil Procedure, but as will be explained, in failing to do so, we believe the trial court abused its discretion.

## IV. Procedural Mechanism for Obtaining Identity

### A. The Cable Communications Policy Act of 1984

■ The Hospital sought an order of discovery of the identity of blogger Doe 1 pursuant to 47 U.S.C.A. § 551 (West 2001 & Supp.2007), the Cable Communications Policy Act of 1984 (CCPA).

The court's initial order to disclose was explicitly made pursuant to the CCPA, as was its later agreed order. The final order does not state the basis for the decision, but it also only overrules Doe's objections to the prior order in setting a new time line for production. It is clear from the sequence of events that the court did consider and believed it was properly applying the federal statute.

The CCPA generally prohibits the disclosure of subscriber information, but provides a safe haven for a cable operator's disclosure of such information when made pursuant to court order.

> (1) Except as provided in paragraph (2), a cable operator shall not disclose personally identifiable information concerning any subscriber without the prior written or electronic consent of the subscriber....
>
> (2) A cable operator may disclose such information if the disclosure is—
> ....
> (B) subject to subsection (h) of this section, made pursuant to a court order authorizing such disclosure, if the subscriber is notified of such order by the person to whom the order is directed;....

47 U.S.C.A. § 551(c)(1), (2). Subsection (h) governs a cable operator's disclosure of subscriber information to a governmental entity, which may only occur pursuant to a court order, and only on proof by clear and convincing evidence of reasonable suspicion of criminal activity and the materiality of the information sought. 47 U.S.C.A. § 551(h). Subsection (h) also provides for a contest of such claim. Id.

The first question that must be answered is whether the federal statute incorporates the provisions in subsection (h) (clear and convincing evidence of a crime), which applies to governmental agencies, into Section 2(B). The difficulty is that Section 2(B), which allows the disclosure pursuant to a court order, specifically states that such is "subject to subsection h" which allows governmental entities to obtain a court order only on showing by clear and convincing evidence that a crime has been committed.

There is an ongoing analytical inconsistency among the few courts that have addressed the application of this statute. Some courts have been willing to apply the statute to discovery by nongovernmental parties. Others have stated that the ability to obtain a proper court order under Section 2(B) is explicitly "subject to" the requirements of subsection (h).

An example of a situation where a court found the "subject to" language inapplicable to private parties is found in *Fitch v. Doe,* 869 A.2d 722 (Me.2005), where the Maine Supreme Court held that a Doe's argument that the statute should be read as a whole

> misapprehends the plain language of the statute. Section 551(c)(2)(B) allows a cable operator to disclose subscriber information when ordered to do so by a court. Section 551(h) imposes a stricter burden when it is a governmental entity seeking that information. If the government wants the information, it must demonstrate, by clear and convincing evidence, reasonable suspicion of criminal activity. When the party seeking infor-

mation is *not* a governmental entity, § 551(h) is not applicable.

*Id.* at 728 (citation omitted).

The Maine court based its interpretation of Section 551(c)(2)(B) on an analogous holding by the Seventh Circuit in *CSC Holdings, Inc. v. Redisi,* 309 F.3d 988 (7th Cir.2002). In *Redisi,* the Seventh Circuit vacated a district court order denying the defendant's discovery request that the plaintiff, a cable operator, turn over copies of its subscriber lists—so that the defendant could contest the plaintiff's damage calculations based on those lists. *Id.* at 996. Citing Section 551(c)(2)(B), the Seventh Circuit stated that "[t]here is no privilege or restriction on releasing customer records to a non-governmental entity pursuant to a court order." *Id.*

Other courts have recognized that the CCPA provides that only "a governmental entity may obtain personally identifiable information concerning a cable subscriber pursuant to a court order...." 47 U.S.C.A. § 551(h). Further, the CCPA does not independently authorize a private (i.e., nongovernmental entity) party's ex parte subpoena to a cable operator. *Interscope Records v. Does 1–7,* 494 F.Supp.2d 388, 390 (E.D.Va.2007); *United States v. Kennedy,* 81 F.Supp.2d 1103, 1110–11 (D.Kan. 2000).

▇ We will follow the interpretation given by the majority of the courts that have addressed this issue and hold that the statute provides a sanctuary for cable operators who disclose personal information to private parties pursuant to a valid court order without imposing the requirements found in subsection (h). However, we also find that the federal statute is not a procedural vehicle for obtaining such a court order. That must be accomplished through some procedural device, either state or federal, depending on the forum of the case. In Texas state courts, the rules of discovery provide ample methods for obtaining information from third parties. In this case, the trial court ordered the release of this private information without regard to any procedural rule that would authorize such release.

Most cases involving this type of question have been formulated under the rules of discovery applicable to that forum. Under the federal rules, as well as our state rules, parties may obtain discovery regarding any matter, not privileged, that is relevant to the claim or defense of any party. FED.R.CIV.P. 26(b)(1); TEX.R. CIV. P. 192.3. This is a broad-ranging ability, but is not one which overarches all possible contests to discovery, as acknowledged in the rules themselves. Thus, in most cases involving Internet lawsuits based on libel or breach of contract, the scenario is that suit is brought against a Doe defendant, and the plaintiff at some point early in the proceeding seeks to discover his or her identity. That relief is sought, not through some all-controlling federal statutory exception—but instead through the discovery tools of that forum, as applied in balancing the right to litigate libel with the constitutional protection of free anonymous speech.[3]

---

3. Some examples of discovery disputes in this context include *Rocker Mgmt. LLC v. John Does 1 Through 20,* No. MISC 03–003 3 CRB, 2003 U.S. Dist. LEXIS 16277 (N.D.Cal.2003, order) (not designated for publication); *Virologic, Inc. v. Doe,* Nos. A101571, A102811, 2004 WL 1941335, 2004 Cal.App. Unpub. LEXIS 8070 (Cal.Ct.App. Sept. 1, 2004) (not designated for publication); *La Societe Metro Cash & Carry France v. Time Warner Cable,* No. CV030197400S, 2003 WL 22962857, 2003 Conn.Super. LEXIS 3302 (Conn.Super.Ct. Dec.2, 2003) (not designated for publication); *John Doe No. 1 v. Cahill,* 884 A.2d 451 (Del.2005) (applying Delaware procedural rules); *Dendrite Int'l, Inc. v. Doe, No. 3,* 342

We believe that the federal statute was not intended or designed as a procedural vehicle to obtain identities of subscribers to the network; the intent of the statute is to prevent the disclosure of such names. But an exception exists, allowing disclosure (and therefore protecting the cable operator from liability for wrongful disclosure) when a proper court order requires such disclosure. We point out that it also does not give carte blanche to a trial court to otherwise release the information without any further consideration. The federal statute does explicitly require that the subscriber be notified before such information is released.

The cases cited by the Hospital in support of the use of the federal statute to justify issuance of the order are not on point—they do not rely on the statute as a mechanism of discovery, but on procedural rules from the forum in which the case was being tried.

To the extent the trial court determined the CCPA serves as an independent ground for justifying discovery in this case, the trial court reached an erroneous legal conclusion.

That does not, however, end our analysis. The next question is whether the trial court was bound to utilize Texas discovery procedures and abused its discretion by failing to do so, and a corollary question of whether there is such a procedure in our discovery rules that would apply? Or finally, was the court free to fashion a form of relief outside the bounds of the Texas Rules of Civil Procedure?

## B. Bill of Discovery

We have concluded that the order issued here was not authorized by the CCPA itself and that no attempt was made to comply with the traditional rules of discovery. Did the trial court have any other basis for issuing this order? To answer that question, it is necessary to discuss the history and usage of the equitable bill of discovery in Texas practice. One of the earliest articles published in the Texas Law Review was authored by W.S. Simkins. W.S. Simkins, Comment, *Bills of Discovery—Act of Thirty–Eighth Legislature*, 2 TEX. L.REV. 98 (1923). In that article, the author called to the bar's attention a new statute that had been enacted by the Legislature in 1923—codified as

N.J.Super. 134, 775 A.2d 756 (2001); *In re Greenbaum v. Google, Inc.*, No. 102063/07, 18 Misc.3d 185, 845 N.Y.S.2d 695, 2007 N.Y. Misc. LEXIS 7274 (Sup.Ct. Oct. 23, 2007); *Klehr Harrison Harvey Branzburg & Ellers, LLP v. JPA Dev., Inc.*, No. 0425, 2006 Phila. Ct. Com. Pl. LEXIS 1 (Phila.Ct.Com.Pl. Jan. 4, 2006).

*See Alvis Coatings v. Does 1–10*, No. 3:04 CV 374–H, 2004 U.S. Dist. LEXIS 30099(W.D.N.C. Dec. 2, 2004, order) (relying on FED.R.CIV.P. 26(b)(1) for discovery mechanism); *Doe v. 2TheMart.com Inc.*, 140 F.Supp.2d 1088, 1090 (D.Wash.2001) (subpoena under FED.R.CIV.P. 45(a)(2)); *In re Subpoena Duces Tecum to Am. Online, Inc.*, No. 40570, 2000 WL 1210372, 2000 Va. Cir. LEXIS 220 (Va.Cir.Ct.2000, order), *rev'd & remanded on other grounds*, 261 Va. 350, 542 S.E.2d 377 (2001) ("Pursuant to Va.Code § 8.01–411").

*See also Arista Records LLC. v. Does 1–19*, No. 07–1649(CKK), 246 F.R.D. 28, 2007 U.S. Dist. LEXIS 78416 (D.D.C. Oct. 11, 2007) (FED. R. CIV.P. 45); *Arista Records LLC v. Does 1–9*, No. 07–CV–00628–EWN–MEH, 2007 WL 1059049, 2007 U.S. Dist. LEXIS 25191 (D.Colo. Apr. 4, 2007) (FED.R.CIV.P. 45); *McMann v. Doe*, 460 F.Supp.2d 259, 263, 265 (D.Mass.2006) (discussing ex parte subpoenas under federal civil procedure, copyright, and other statutes); *UMG Recordings, Inc. v. Does 1–4*, No. 06–0652 SBA, 2006 U.S. Dist. LEXIS 32821 (N.D.Cal. Mar. 6, 2006) (FED.R.CIV.P. 45 and Local Rule 7–11(a)); *In re Baxter*, No. 01–00026–M, 2001 WL 34806203, 2001 U.S. Dist. LEXIS 26001(W.D.La. Dec. 20, 2001) (FED. R. CIV.P. 27); *Apple Computer, Inc. v. Doe 1*, No. 1–04–CV–032178, 2005 WL 578641, at *2 (Cal.Super.Ct. Mar. 11, 2005) (California discovery statute).

Article 2002, which authorized a bill of discovery. In discussing this development, the article traces the use of such an equitable bill of discovery.

The bill of discovery originated because under the common law adopted in Texas in 1840, parties to the suit were incompetent to testify. To provide relief from this rule, under the common law a bill of discovery could be filed in chancery court and that court could order a "full confession of the facts" which could be used as evidence in the cause at law. But, according to the article, after Texas provided for written interrogatories in 1846, the separate suit in chancery was unnecessary. Then in 1858, a bill[4] was passed permitting oral examination of the parties. Apparently that procedure was in place until 1897 when "some lawyer, evidently having a case which necessitated a change for his convenience," authored a bill preventing the taking of depositions "ex parte" when a corporation was a party to the suit. So in 1923, the Legislature enacted Article 2002, which allowed the trial courts to issue bills of discovery and grant relief in accordance with the usages of courts of equity. *Id.*

Article 2002 remained in our law until the "new" Rules of Civil Procedure were enacted in 1941, at which time Article 2002 was repealed and Rule 737 incorporated its terms. *Repealed by* Rules of Civil Procedure (Acts 1939, 46th Leg., p. 201, § 1). Finally, in 1999, the rules regarding discovery were substantially changed and Rule 737 was replaced and limited by Rule 202. Tex.R. Civ. P. 737, *repealed by* Order of Aug. 5, 1998 and Nov. 9, 1998, eff. Jan. 1, 1999; *see* Nathan L. Hecht & Robert H. Pemberton, A Guide to the 1999 Texas Discovery Rules Revisions (1998), http://adrr.com/law1/rules.htm.

So the rule now containing vestiges of the bill of discovery has been incorporated into Rule 202. Neither that rule, nor any other procedural rule, was used in this proceeding. Does the trial court still retain authority to issue such a discovery order by virtue of the common law equitable bill of discovery? We think not.

Prior to the enactment of any statute or rule authorizing a bill of discovery, the Texas Supreme Court addressed the issue in *Kountze v. Cargill*, 86 Tex. 386, 25 S.W. 13 (1894). The court stated: "If the courts of equity in England ever entertained bills of discovery of this character, and if the jurisdiction became incorporated into our system of jurisprudence by the adoption of the common law, we are still of opinion that it is no longer the law of this State." *Id.* at 399, 25 S.W. 13. As mentioned earlier, the Legislature enacted a law in 1923 specifically allowing a bill of discovery. After the passage of the bill of discovery statute, an opinion dealt again with this issue. *Chapman v. Leaverton*, 263 S.W. 1083 (Tex.Civ.App.-Fort Worth 1924, writ ref'd) (motion for rehearing overruled combined with a number of other cases at 114 Tex. 375, 269 S.W. 1024, 1029 (Tex. 1925)). In *Chapman*, the court held that the Legislature's act of reviving the bill of discovery "intended to confer some additional remedy in favor of the plaintiff or the judgment creditor, in order that he might discover facts which would be advantageous to him in the furtherance of his cause of action or in the collection of his judgment." *Id.* at 1086. In denying the writ of error, the Texas Supreme Court agreed that the Fort Worth Court of Civil Appeals had "correctly construed" the bill of discovery statute. 269 S.W. at 1069.

4. *See* 4 *H.P.N. Gammel, The Laws of Texas 1822–1897,* at 982–83, http://texashistory.unt. edu/permalink/meta-pth-6730:986.

This interpretation was followed in *Dallas Joint Stock Land Bank v. State ex rel. Cobb,* 135 Tex. 25, 137 S.W.2d 993 (1940), and *Hastings Oil Co. v. Tex. Co.,* 149 Tex. 416, 234 S.W.2d 389 (1950).

These events demonstrate that in 1894 the Texas Supreme Court declared that the jurisprudence of the State of Texas did not include a common law equitable bill of discovery. Since that time, the bill of discovery has been available only by statutory or rule authorization. No such general bill of discovery statute or rule now exists; instead, the discovery process in Texas is now thoroughly controlled by specific rules. Based on these authorities, even if the order in this case could be considered one pursuant to a motion for a bill of discovery, we find that the trial court did not have authority to grant such a discovery order other than as sanctioned and regulated by the Texas rules for discovery.

■■■■■ A trial court does, of course, have inherent power to facilitate litigation of lawsuits and prevent abuse of process—although that is partially promoted by, and partially guided by, the Texas Rules of Civil Procedure. *Waguespack v. Halipoto,* 633 S.W.2d 628, 629 (Tex.App.-Houston [14th Dist.] 1982, writ dism'd w.o.j.). Thus, between the court's "inherent power" and the applicable rules of procedure and evidence, judges have broad, but not unfettered, discretion in handling trials. *Metzger v. Sebek,* 892 S.W.2d 20, 38–39 (Tex.App.-Houston [1st Dist.] 1994, writ denied).[5]

In jurisdictional contexts, the Texas Supreme Court has consistently held that trial courts have only

> such powers and jurisdiction as are directly provided by law, and, in addition thereto, they have such further powers and jurisdiction as are reasonably proper and necessary,-that is, as ought to be inferred, from the powers and jurisdiction directly granted.

*Ex parte Hughes,* 133 Tex. 505, 129 S.W.2d 270, 273–74 (1939).

In the context of procedural rules involving discovery, the Texas Supreme Court has similarly

> held to the doctrine that Texas courts have no inherent powers, either at law or in equity, not even to originate new process to enable parties to secure evidence in support of their cases.... So if the trial court had authority to issue the order complained of it must be found in the written law or it must arise by reasonably necessary implication therefrom.

*Hastings Oil Co. v. Tex. Co.,* 149 Tex. 416, 234 S.W.2d 389, 393 (1950) (cited with approval in *Pope v. Ferguson,* 445 S.W.2d 950, 952 (Tex.1969)).[6]

**5.** *See* Tex.R. Civ. P. 270 (allowing court discretion to permit "additional evidence" to be offered); Tex.R. Civ. P. 286 (stating that "[a]dditional argument may be allowed in the discretion of the court" in event jury receives further instructions after having retired); Tex.R. Evid. 611(a) (giving court "reasonable control" over interrogation of witnesses and presentation of evidence); *Tex. Employers Ins. Ass'n v. Loesch,* 538 S.W.2d 435, 440 (Tex. Civ.App.-Waco 1976, writ ref'd n.r.e.) (holding that court may place some limits on voir dire examination). The trial court's authority to dismiss for want of prosecution stems from Rule 165a of the Texas Rules of Civil Procedure as well as the court's inherent power. *Villarreal v. San Antonio Truck & Equip.,* 994 S.W.2d 628, 630 (Tex.1999). "By rule, statute, and their own inherent power, trial courts have broad authority to sanction litigants for specific misconduct." *In re N.R.C.,* 94 S.W.3d 799, 807 n. 4 (Tex.App.-Houston [14th Dist.] 2002, pet. denied); *see also Onstad v. Wright,* 54 S.W.3d 799, 804 (Tex.App.-Texarkana 2001, pet. denied).

**6.** "Whatever may be the powers of courts of other States, there can be no doubt that the courts of Texas must look to the Constitution of this State, the enactments of the Legisla-

■ An extensive system is in place governing procedures applicable to this situation; in the absence of some extraordinary reason to depart from those procedures, trial courts do not have the inherent authority to create their own ad hoc procedures.

## C. The Texas Discovery Rules

Texas discovery rules provide a mechanism for an orderly process of discovery which was not utilized in this case. One relevant portion of the rule governing discovery from nonparties is TEX.R. CIV. P. 205.1(c), (d), which authorizes discovery from a nonparty by serving a subpoena compelling production of documents and tangible things under the rule. That rule also allows a party to compel discovery from a nonparty by obtaining a court order under TEX.R. CIV. P. 196.7, 202, or 204.[7]

Another source of authority is TEX.R. CIV. P. 205.3, which provides that a party may compel production from a nonparty by serving notice and a subpoena compelling production or inspection. Rule 205.3(d) provides that the nonparty must respond to the notice and subpoena in accordance with TEX.R. CIV. P. 176.6. Rule 176.6(d) provides a procedure for objecting effectively to the issuance of discovery orders under 176.6(c) (referencing Rule 193.7). Subsection (d) states that the non-

party may object and withhold material claimed to be privileged. Under some circumstances, Rule 176.6(e) further allows counsel to seek a protective order under the procedures set out in TEX.R. CIV. P. 192.6.

There is also a specific section specifying how hearings are to be noticed, heard, and conducted on objections and assertions of privilege. TEX.R. CIV. P. 193.4.[8]

Similarly, under TEX.R. CIV. P. 199.2(b)(5), which sets out procedures for noticing oral depositions, if the witness is a nonparty, the request must comply with TEX.R. CIV. P. 205, and the nonparty's response to the request is governed by TEX.R. CIV. P. 176 and 205.

Rule 202, which supplanted the former Rule 737 relating to a bill of discovery, allows the taking of a deposition to investigate a potential claim or suit. TEX.R. CIV. P. 202.1(b).

■ The result is this: An order compelling production could have been issued pursuant to the rules of procedure. The mechanisms set out in the rules of discovery that might authorize and regulate such an order (and also the protections to the person inherent in those procedures) were not utilized. Instead, counsel sought and originally obtained an ex parte order entirely outside the rules, based on the application of a statute that is not relevant to

ture, and the common law, for their authority to proceed as requested in this case [to require an injured plaintiff to submit to a physical examination], and, if the authority did not exist at common law, and has not been conferred by the Constitution, nor by the statutes of this State, then no court in Texas has the power to force any citizen to submit to a physical examination under such circumstances." *Austin & Nw. R.R. v. Cluck,* 97 Tex. 172, 77 S.W. 403, 405 (1903).

7. Rule 196.7 involves entry onto land, and is inapplicable. TEX.R. CIV. P. 202.1, *et seq.* controls the method of obtaining depositions to

perpetuate testimony or to investigate a potential claim. TEX.R. CIV. P. 204.1, *et seq.* explains how a party may obtain an order compelling another party to submit to physical or mental examination.

8. We note that, had that procedural safeguard been applied, the late-filed affidavits and exhibits tendered by the Hospital post-hearing, and four days before the order was signed, would not have been considered. The rule requires such evidence to be served at least seven days before the hearing. TEX.R. CIV. P. 193.4(a).

this situation. By not attempting to follow any rules regarding discovery, the parties and the court were operating without rules concerning such matters as when objections or privileges should be raised, when evidence must be submitted, when and if a protective order was available, and many other matters. Finally, when no rules are employed, it is impossible to adequately review the propriety of the actions taken by the parties and the court.

### D. Conclusion

Texas rules provide a comprehensive procedure for seeking discovery. They were not used, over direct complaint by counsel for Doe 1. We have found no other procedural basis for a trial court to issue such a discovery order.

 A trial court's ruling that requires production beyond what our procedural rules permit is an abuse of discretion. *In re Dana Corp.*, 138 S.W.3d 298, 301 (Tex.2004); *see, e.g., Texaco, Inc. v. Sanderson*, 898 S.W.2d 813, 815 (Tex.1995) (orig.proceeding). Similarly, a writ may issue where the trial court's order improperly restricts the scope of discovery defined by the Texas Rules of Civil Procedure. *Lindsey v. O'Neill*, 689 S.W.2d 400, 401 (Tex.1985).

 We conclude that, when a discovery order entirely fails to apply the rules of discovery, issuance of mandamus requiring the trial court to utilize those rules and procedures is appropriate.[9]

Because of the unusual posture of this case, and because of the dearth of Texas authority on this subject, we will attempt to provide some guidance for the trial court in applying the rules of discovery in

light of the types of constitutionally-based objections that have already been raised to the discovery, should this matter be presented again in this cause.

## V. Constitutional Requirements for Ordering the Disclosure of Anonymous Internet Authors

### A. First Amendment Protection

 The First Amendment protects anonymous speech. *See Buckley v. Am. Constitutional Law Found.*, 525 U.S. 182, 199–200, 119 S.Ct. 636, 142 L.Ed.2d 599 (1999). The Supreme Court has noted that "[a]nonymity is a shield from the tyranny of the majority." *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 356, 115 S.Ct. 1511, 131 L.Ed.2d 426 (1995). Indeed, "[u]nder our Constitution, anonymous pamphleteering is not a pernicious, fraudulent practice, but an honorable tradition of advocacy and of dissent." *Id.*

 First, an author's decision to remain anonymous, like other decisions concerning omissions or additions to the content of a publication, is an aspect of the freedom of speech protected by the First Amendment. *McIntyre*, 514 U.S. at 342, 115 S.Ct. 1511.

 Second, the protections of the First Amendment extend to the Internet. *See Reno v. ACLU*, 521 U.S. 844, 870, 117 S.Ct. 2329, 138 L.Ed.2d 874 (1997). "Courts have recognized the Internet as a valuable forum for robust exchange and debate." *Sony Music Entm't, Inc. v. Does 1–40*, 326 F.Supp.2d 556, 562 (S.D.N.Y. 2004); *Best W. Int'l v. Doe*, No. CV–06–1537–PHX–DGC, 2006 WL 2091695 (D.Ariz. July 25, 2006, order).

---

**9.** We recognize that Tex.R. Civ. P. 191.1 allows the procedures and limitations set out by the rules of discovery to be modified by agreement, or by court order for good cause. Neither situation exists in this case. There was no agreement, and there was no pleading or finding that good cause existed to modify the rules of discovery in this suit.

■ Speech over the Internet is afforded no lower level of First Amendment scrutiny. *Reno,* 521 U.S. at 870, 117 S.Ct. 2329. Indeed, the Supreme Court has characterized Internet speech by the same terms as traditional political speech: "Through the use of chat rooms, any person with a phone line can become a town crier with a voice that resonates farther than it could from any soapbox. Through the use of Web pages, mail exploders, and newsgroups, the same individual can become a pamphleteer." *Id.* at 870, 117 S.Ct. 2329; *see also Doe v. Cahill,* 884 A.2d 451, 456 (Del.2005) ("Anonymous internet speech in blogs or chat rooms in some instances can become the modern equivalent of political pamphleteering.").[10]

■ Several courts have noted that Internet anonymity serves a particularly vital role in the exchange of ideas and robust debate on matters of public concern. *See, e.g., Doe v. 2TheMart.com Inc.,* 140 F.Supp.2d 1088, 1092–93 (W.D.Wash.2001) (Internet exchange of ideas "driven in large part by the ability of Internet users to communicate anonymously"); *Columbia Ins. Co. v. Seescandy.com,* 185 F.R.D. 573, 578 (N.D.Cal.1999). The protection of Internet speech also includes the protection of anonymous electronic speech. *See, e.g., 2TheMart.com Inc.,* 140 F.Supp.2d at 1092 ("The right to speak anonymously extends to speech via the Internet.").

**B. Limitations on the Right of Free Speech**

■ The First Amendment is not intended to protect unconditionally all forms of expression. *See Beauharnais v. Illinois,* 343 U.S. 250, 266, 72 S.Ct. 725, 96 L.Ed. 919 (1952) (libelous statements are outside the realm of constitutionally pro-

tected speech). The right to speak anonymously is therefore not absolute. However, this right would be of little practical value if there was no concomitant right to remain anonymous after the speech is concluded. *2TheMart.com Inc.,* 140 F.Supp.2d at 1093. Those who suffer damages as a result of tortious or other actionable communications on the Internet are clearly able to seek a remedy. Therefore, while the anonymous subscribers in this case have a First Amendment right to anonymous speech on the Internet, that right is subject to limitation. *Polito v. AOL Time Warner, Inc.,* No. 03CV3218, 2004 WL 3768897, 2004 Pa. Dist. & Cnty. Dec. LEXIS 340 (Pa. D. & C. Jan. 28, 2004). The courts must balance the right to communicate anonymously with the right to hold accountable those who engage in communications that are not protected by the First Amendment. Thus, although the right to speak anonymously "would be of little practical value if … there was no concomitant right to remain anonymous" in the face of a civil action subpoena, a civil litigant has an interest in asserting his or her rights through the litigation process against an anonymous tortfeasor. *Id.; see Cahill,* 884 A.2d at 456. As in other venues, therefore, anonymous (electronic) speakers may not freely defame individuals without facing civil responsibility for their acts. *McMann v. Doe,* 460 F.Supp.2d 259, 263 (D.Mass. 2006).

There are no cases in Texas directly on point. This is, however, far from the first court to be confronted with this problem. The common threads among the various jurisdictions involve available means for discovery and the proper application of that means when confronted with a consti-

---

**10.** Anonymous speech has a long history, including Alexander Hamilton's contributions to the Federalist Papers in which he used the pseudonym "Publius." *See, e.g.,* The Federalist No. 23 (Alexander Hamilton).

tutional right that otherwise prevents the information from being obtained. Thus, the question is: When does a plaintiff have a right to discover the identity of the writer in light of the constitutional right to anonymous free speech?

As noted by a number of the cases referenced in this opinion, the chilling effect on the First Amendment right of free speech that results from making such "confidential" information too easily accessible is apparent.[11] The cases spend a considerable—and appropriate—amount of time discussing the national interest in not inappropriately restricting the free flow of thought and discussion by unsupported threats of litigation. However, they also acknowledge that the anonymity of the blogger can be overcome under certain circumstances.

To that extent, the cases are in accord. The point of departure is in determining exactly how much and what kind of proof of libel or defamation is enough to justify cutting though the constitutional protection to allow the identification of the anonymous contributors.

## C. Quantum of Proof Required

The cases that have decided this issue range from placing an extremely light burden (indeed, virtually no burden at all) on the plaintiff, to requiring the plaintiff to tender proof of its allegations that would survive a summary judgment, or even more stringent requirements. At least one case has essentially concluded that the mere allegation of libel is sufficient. *Alvis Coatings, Inc. v. John Does One Through Ten*, No. 3:04CV374–H, 2004 WL 2904405, 2004 U.S. Dist. LEXIS 30099 (W.D.N.C. Dec.2, 2004). Other cases have articulated requirements that are so weak as to essentially require no more than allegations made in good faith (or not in bad faith), with some evidence to support the allegations. *See Polito*, 2004 Pa. Dist. & Cnty. Dec. LEXIS 340.

We cannot agree that either of these formulations is sufficient to survive any form of constitutional balancing. Thus, the question becomes the degree of actual proof that must be provided before the balance tips in favor of piercing the constitutional shield and disclosing the identity of the anonymous blogger.

 We find ourselves more in alignment with the formulations set out in *Cahill*, 884 A.2d at 458–61. *See extensive discussion about the application of this standard in Best W. Int'l*, 2006 WL 2091695. The court in *Cahill* described the test as: "[B]efore a defamation plaintiff can obtain the identity of an anonymous defendant through the compulsory discovery process he must support his defamation claim with facts sufficient to defeat a summary judgment motion." *Cahill*, 884 A.2d at 460. This standard does not require a plaintiff to prove its case as a matter of undisputed fact, but instead to produce evidence sufficient to create issues that would preclude summary judgment.

As correctly noted in *Best Western*, other courts have recognized a range of possible showings—"ranging (in ascending order) from a good faith basis to assert a claim, to pleading sufficient facts to survive a motion to dismiss, to a showing of *prima facie* evidence sufficient to withstand a motion for summary judgment and, beyond that, hurdles even more stringent." *Best W. Int'l*, 2006 WL 2091695, at *4; *see Cahill*, 884 A.2d at 457.

---

11. *See* Glenn Harlan Reynolds, *Libel in the Blogosphere: Some Preliminary Thoughts*, 84 Wash. U.L.Rev. 1157 (2006); Daniel J. Solove, *A Tale of Two Bloggers: Free Speech and Privacy in the Blogosphere*, 84 Wash. U.L.Rev. 1195 (2006).

, The Arizona court recognized that the conduct was purely expressive—where in *Polito* a type of harassment was involved—and that the Does were expressing "their views on issues of interest to BWI members and governors in a forum specifically designed for an exchange of opinions and ideas anonymously." The court concluded that such speech is entitled to substantial First Amendment protection.

The district court imposed a summary judgment standard before discovery was available to discover the identities of the John Doe defendants. As described, the standard does not require a plaintiff to prove its case as a matter of undisputed fact, but instead to produce evidence sufficient to establish the plaintiff's prima facie case.

The court opined, citing *Cahill*:

[T]o obtain discovery of an anonymous defendant's identity under the summary judgment standard, a defamation plaintiff must submit sufficient evidence to establish a *prima facie* case for each essential element of the claim in question. In other words, the defamation plaintiff, as the party bearing the burden of proof at trial, must introduce evidence creating a genuine issue of material fact for all elements of a defamation claim *within plaintiff's control.*

*Best W. Int'l*, 2006 WL 2091695; *Cahill*, 884 A.2d at 465.[12]

The court noted that, because pleading standards are so lenient, it could not conclude that the complaint was asserted in bad faith, or that it would likely be subject to a motion to dismiss.

Thus, if the standard for permitting discovery of the John Doe Defendants' identities required only good faith or the ability to survive a motion to dismiss, BWI's proposed discovery would be permitted and the Defendants' First Amendment right to anonymous speech would be defeated. A good faith allegation of wrongdoing, devoid of factual detail, would suffice.

*Best W. Int'l*, 2006 WL 2091695.

The court held that:

[M]ore is needed before a defendant's First Amendment rights may be eliminated. The Court must examine facts and evidence before concluding that a defendant's constitutional rights must surrender to a plaintiff's discovery needs. The summary judgment standard will ensure that the Court receives such facts and evidence.

*Id.*

██ We agree with this analysis.[13] The Hospital has made several claims

12. In *Cahill,* the Delaware Supreme Court held that a public figure was not required to produce evidence of actual malice since such proof would be almost impossible before the author is identified. *Cahill,* 884 A.2d at 464 ("a public figure defamation plaintiff must only plead and prove facts with regard to elements of the claim that are within his control"). The failure to require such proof has been criticized. *See McMann,* , 460 F.Supp.2d at 267.

The actual malice requirement is an additional level of constitutional protection that applies only in particular circumstances for the imposition of liability, not discovery. A

rule for identifying anonymous writers should be one of general application rather than one attempting to incorporate the special provision required for unusual situations. If an actual malice finding is required to impose liability, that will be determined at a later stage of the proceedings.

13. Adapting the summary judgment standard to Texas procedure, the trial court should view the matter as if Doe 1 had filed a traditional motion for summary judgment establishing its defense by alleging that his identity was protected from disclosure by virtue of the First Amendment right of free speech. To obtain the requested discovery, the Hospital

based not only on defamation, but also business disparagement and other matters. We will not attempt to express an opinion on the merits of these arguments. We anticipate that, if this matter is again presented to the trial court, this opinion will provide guidance concerning the procedure to be employed and the standard for testing the evidence.

For the reasons stated, we conditionally grant the writ of mandamus and order the trial court to vacate its order and proceed in accordance with this opinion. We are confident the trial court will comply, and our writ will issue only if it does not.

See also, 162 S.W.3d 632.

would then be required to produce evidence which would be sufficient to preclude the granting of a summary judgment. *See M.D. Anderson Hosp. & Tumor Inst. v. Willrich,* 28 S.W.3d 22, 23 (Tex.2000) ("[t]he nonmovant has no burden to respond to a summary judgment motion unless the movant conclusively establishes its cause of action or defense").